# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 12, 2019            Decided June 14, 2019

No. 18-1134

SOUTHWEST AIRLINES CO. AND AMERICAN AIRLINES, INC.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

SFPP, L.P.,
INTERVENOR

———

Consolidated with 18-1136, 18-1137, 18-1138

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Steven A. Adducci* argued the cause for petitioners. With him on the briefs were *Thomas J. Eastment*, *Gregory S. Wagner*, *Matthew D. Field*, and *Richard E. Powers Jr.*

*Anand R. Viswanathan*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondents. With him on the brief were *Robert J. Wiggers* and *Robert B. Nicholson*, Attorneys, U.S. Department of Justice, *James P.*

*Danly*, General Counsel, Federal Energy Regulatory Commission, *Robert H. Solomon*, Solicitor, and *Elizabeth E. Rylander*, Attorney. *Robert M. Kennedy Jr.*, Attorney, Federal Energy Regulatory Commission, entered an appearance.

*Charles F. Caldwell* argued the cause for intervenor. With him on the brief were *Daniel W. Sanborn*, *Michelle T. Boudreaux*, and *Sabina D. Walia*.

Before: TATEL, MILLETT, and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The Federal Energy Regulatory Commission uses a streamlined "indexing" method to ensure that when oil pipelines raise their rates, the resulting charges remain reasonable. Every summer, the Commission calculates an "index" that reflects inflation between the previous two calendar years, and pipelines may, through an expedited process, rely on that index to increase their rates. If a pipeline's customers believe that a particular rate increase, though index-compliant, is still too high, then they may challenge that rate in a proceeding before the Commission. These consolidated cases concern the kind of evidence the Commission deems relevant to such proceedings. In 2014, a group of customers filed complaints against the 2012 and 2013 index-based rate increases implemented by pipeline-owner SFPP, L.P. The Commission, departing from its previous practice, dismissed those complaints by relying on data generated *after* the challenged increases went into effect. Because the Commission failed to provide sufficient reasons for changing its policy, we vacate the challenged orders and remand for the Commission to explain or reconsider its decision to take into account post-rate-increase information.

## I.

For over a century, oil pipelines have been subject to regulation as common carriers under the Interstate Commerce Act. *See* Act of June 29, 1906, Pub. L. No. 59-337, § 1, 34 Stat. 584, 584 (extending the Interstate Commerce Act's definition of "common carriers" to include oil pipelines). For most of this time, the pipelines' federal regulators—first the Interstate Commerce Commission and now the Federal Energy Regulatory Commission—used complex "fair value" or "cost-based" ratemaking methodologies, *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1428–29 (D.C. Cir. 1996) (internal quotation marks omitted), to prevent pipelines from unlawfully charging "unjust and unreasonable" rates, 49 U.S.C. app. § 1(5)(a) (1988). In the Energy Policy Act of 1992, however, Congress directed the Federal Energy Regulatory Commission to "streamline [its] procedures" and reduce "unnecessary regulatory costs and delays" by "establish[ing] a simplified and generally applicable ratemaking methodology for oil pipelines." Pub. L. No. 102-486, §§ 1801(a), 1802(a), 106 Stat. 2776, 3010.

As a result, an "indexing" scheme has replaced cost-of-service proceedings as the Commission's primary tool for regulating pipeline rates. *See* Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992, Order No. 561, 58 Fed. Reg. 58,753, 58,754 (Nov. 4, 1993) (explaining that the "Commission believes that indexing of oil pipeline rates will eliminate the need for much future cost-of-service litigation"). Emphasizing that "the hallmark of an indexing system is simplicity," the Commission explained that pipelines (also called "carriers") could use the new method to "adjust [their] rates . . . for inflation-driven cost changes without the need [for] strict regulatory review of the pipeline's individual cost of service." *Id.* at 58,758. By permitting the "nominal level of rates to rise" with "general economy-wide

costs," the Commission stated, "indexing, conceptually, [would] merely preserve[] the value of just and reasonable rates in real economic terms." *Id.* at 58,759.

The nuts and bolts of indexing work like this: For every "index year," which runs from July 1 to June 30, the Commission publishes no later than June 1 an index "based on the change in the final Producer Price Index for Finished Goods (PPI-FG) . . . for the two calendar years immediately preceding the index year." 18 C.F.R. § 342.3(c), (d)(1), (d)(2). So, for example, the Commission recently calculated the index for the twelve-month period spanning July 1, 2019, to June 30, 2020, by comparing the 2018 PPI-FG to the 2017 PPI-FG. *See* Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992, Notice of Annual Change in the Producer Price Index for Finished Goods, 167 FERC ¶ 61,122, at 1 (May 10, 2019). Once an index is set, each pipeline then computes its own maximum allowable rate—its so-called ceiling level— "by multiplying the previous index year's ceiling level by the [Commission's] most recent index." 18 C.F.R. § 342.3(d)(1). A pipeline may "at any time" increase its rates "to a level which does not exceed [its] ceiling level." *Id.* § 342.3(a).

The Commission recognizes that, though efficient, an indexing scheme based on "economy-wide costs" may at times produce rates significantly out of step with individual pipelines' financial realities. Revisions to Oil Pipeline Regulations Pursuant to the Energy Policy Act of 1992, 58 Fed. Reg. at 58,759. For this reason, the Commission permits pipeline customers (also called "shippers") to "challenge existing rates, even if such rates are below the applicable ceiling levels, if [those customers] reasonably believe such rates are excessive." *Id.* at 58,754. These index-based rate challenges come in two varieties: protests, which address proposed rates, and complaints, which address "existing rate[s]

or practice[s]." 18 C.F.R. § 343.1. In both types of proceedings, the challenger must "allege reasonable grounds for asserting . . . that the rate increase is so substantially in excess of the actual cost increases incurred by the carrier that the rate is unjust and unreasonable." *Id.* § 343.2(c)(1). How the Commission evaluates those allegations, however, depends on whether the shipper brings its challenge in the form of a protest or a complaint.

Because protests proceed extremely quickly—they must be filed within fifteen days of a rate's publication, *see id.* § 343.3(a), and the Commission has only thirty days from the rate's filing date to "determine whether to . . . initiate a formal investigation," *id.* § 343.3(c)—the Commission evaluates protests with a "quick snapshot approach" called the "percentage comparison test," *BP West Coast Products, LLC v. SFPP, L.P.*, 121 FERC ¶ 61,141, at PP 6–7 (2007). Using annual cost data found on page 700 of the pipeline's "Form No. 6," the Commission performs the percentage comparison test by computing "the change in the prior two years' total cost-of-service data." *SFPP, L.P.*, 163 FERC ¶ 61,232, at P 4 (2018); *see also* 18 C.F.R. § 357.2 (detailing oil pipelines' annual reporting obligations). "[I]f there is [a] 10 percent or more differential between" the percentage-point change in the pipeline's costs and the percentage-point change in its proposed rate, then "the Commission will investigate [the] protested indexed rate change." *SFPP*, 163 FERC ¶ 61,232, at P 4; *see, e.g.*, *North Dakota Pipeline Co.*, 163 FERC ¶ 61,235, at P 11 (2018) (the Commission would investigate a July 2018 index-based rate increase of 4.41% when costs declined by 15.5% from 2016 to 2017).

In contrast to protests, complaints are subject to a two-year statute of limitations, *see* 49 U.S.C. app. § 16(3)(b) (1988), and the Commission enjoys a "more extended time frame in which"

to consider them, *BP West Coast Products*, 121 FERC ¶ 61,141, at P 7. As a result, in the context of complaints only, the Commission interprets the regulatory phrase "substantially in excess of the [pipeline's] actual cost increases," 18 C.F.R. § 343.2(c)(1), to "provid[e] for the review of either a percentage increase or a dollar increase" in costs, *BP West Coast Products*, 121 FERC ¶ 61,141, at P 5; *see also BP West Coast Products LLC v. SFPP, L.P.*, 123 FERC ¶ 61,121, at P 6 (2008) (explaining that "the Commission only applies a percentage test when reviewing a protest and normally applies that test for complaints," but will "use[] a dollar comparison . . . under . . . limited circumstances"). To determine whether a pipeline's "dollar increase" is excessive, the Commission applies the so-called substantially exacerbate test, under which a complaint "must show (1) that the pipeline is substantially over-recovering its cost of service and (2) that the indexed based [rate] increase so exceeds the actual increase in the pipeline's cost that the resulting rate . . . would substantially exacerbate that over-recovery." *BP West Coast Products*, 121 FERC ¶ 61,141, at PP 5, 10. Put simply, an index-based increase might produce a rate "substantially in excess of the [pipeline's] actual cost increases," *id.* at P 5, if the pipeline's revenues are already significantly higher than its costs *and* if its rate increase amplifies that over-recovery.

This case began in June 2014, when several shippers (the "Shippers") filed timely complaints alleging that SFPP's 2012 and 2013 index-based rate increases failed the substantially exacerbate test. Claiming that SFPP was already over-recovering its costs at the time it applied its rate increases in 2012 and 2013, the Shippers, citing page 700 data showing that SFPP's costs had decreased between the two years preceding each rate increase, argued that the new, higher rates "would substantially exacerbate" those over-recoveries. *Id.* at P 10. Specifically, the Shippers alleged that (1) SFPP experienced a

4.48% decrease in costs between 2010 and 2011, yet in 2012 it implemented a rate increase that would exacerbate its 2011 over-recovery of $18,368,119 by at least $6.9 million; and (2) SFPP experienced another 0.56% decrease in costs between 2011 and 2012, yet in 2013 it implemented a rate increase that would exacerbate its 2012 over-recovery of $14,323,805 by at least $7.15 million.

The Commission dismissed the complaints in December 2016. *See Hollyfrontier Refining & Marketing LLC v. SFPP, L.P.*, 157 FERC ¶ 61,186, at P 1 (2016). Its logic was simple: "[n]otwithstanding the application of the 2012 and 2013 index increases," the Commission explained, "SFPP's Page 700s on file at the time of the complaints show[ed] that the difference between SFPP's costs and revenues declined from . . . 2011 [to] 2012 [to] 2013." *Id.* at P 9. Consequently, because "the 2012 and 2013 index increases did not, in fact, substantially exacerbate the pre-existing difference between SFPP's revenues and costs," the Commission concluded that the complaints "fail[ed] the second part of the 'substantially exacerbate' test." *Id.*

In dismissing the complaints, the Commission "reject[ed] the . . . Shippers' contention that [it] should only evaluate the complaints based upon the two years prior to each index increase, i.e., (a) 2010 and 2011 Page 700 data for . . . [the] 2012 index increase and (b) 2011 and 2012 Page 700 data for . . . [the] 2013 index increase," *id.* at P 10, and instead chose to consider "the facts available at the time . . . the complaints" were filed in June 2014, *id.* at P 9. Acknowledging that it had "previously held that the only relevant data for evaluating an index rate change are the data from the two years prior to the index change," the Commission stated that it had "applied this policy when investigating . . . protest[s] within 15 days of the challenged indexed rate filing." *Id.* at P 10. In this proceeding,

by contrast, the "Shippers waited two years after the 2012 rate increase and one year after the 2013 index increase to file their complaints," so, according to the Commission, "[t]his case present[ed] different circumstances" than the Commission had encountered before. *Id.*

The Commission denied the Shippers' request for rehearing in March 2018. *See Hollyfrontier Refining & Marketing LLC v. SFPP, L.P.*, 162 FERC ¶ 61,232 (2018). Reiterating that its December 2016 order had "interpret[ed] the Commission's rate complaint regulations . . . in a context that the Commission had not previously had occasion to address"— that is, a "situation where additional Page 700 data was available to shed light on the allegations contained in the . . . Shippers' complaints"—the Commission explained that "when shippers delay challenging [index-based] rates for one or two years, a different process may be employed to take into account data that became available prior to the complaint." *Id.* at PP 13–14, 16. The Commission "elected to use that data" because, in its view, "it would be inefficient and inequitable to 'ignore evidence that was available at the time the . . . Shippers filed their complaints' when that information 'undermines the basis of the . . . Shippers' claim.'" *Id.* at P 14 (quoting *Hollyfrontier Refining & Marketing*, 157 FERC ¶ 61,186, at P 10). The Shippers timely filed petitions for review.

## II.

One of the most fundamental principles of administrative law is that agencies must give reasons for their actions. The Administrative Procedure Act directs courts to enforce this obligation by "hold[ing] unlawful and set[ting] aside agency action[s]" that are "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A), a task that requires courts "not to substitute [their] judgment for that of the agency" but rather to ensure that whatever the agency has decided, it has "examine[d] the

relevant data and articulate[d] a satisfactory explanation" for its actions, *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). Although "[w]e will . . . uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," we may not "attempt . . . to make up for such deficiencies" ourselves by "supply[ing] a reasoned basis for the agency's action that the agency itself has not given." *Id.* (internal quotation marks omitted).

"A full and rational explanation" becomes "especially important" when, as here, an agency elects to "shift [its] policy" or "depart[] from its typical manner of" administering a program. *Great Lakes Gas Transmission Ltd. Partnership v. FERC*, 984 F.2d 426, 433 (D.C. Cir. 1993). The agency "need not demonstrate . . . that the reasons for the new policy are *better* than the reasons for the old one," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), but it must at least "acknowledge" its seemingly inconsistent precedents and either offer a reason "to distinguish them" or "explain its apparent rejection of their approach," *Tennessee Gas Pipeline Co. v. FERC*, 867 F.2d 688, 692 (D.C. Cir. 1989). This is not an especially high bar: "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox Television*, 556 U.S. at 515. But however the agency justifies its new position, what it may not do is "gloss[] over or swerve[] from prior precedents without discussion." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).

Until this case, when considering protests and complaints alike, the Commission always relied exclusively on data from the two calendar years preceding the challenged rate to determine whether the increase was "substantially in excess of

the actual cost increases incurred by the carrier." 18 C.F.R. § 343.2(c)(1). But in the orders at issue in this case, the Commission dismissed the Shippers' complaints based on financial data generated *after* the challenged index-based rates had taken effect. The Commission concedes as much. *See* Oral Arg. Rec. 21:12–26 (conceding that the Commission is unaware of any previous protest or complaint case in which it considered post-rate-increase information).

What the parties dispute is just how far the Commission has journeyed from its previously trodden path. The Commission tells us that it has done nothing more than consider the best available information—information which, given the "unusual circumstance" occasioned by the Shippers' "filing delay," happens to include the "more recent and more representative data" generated by SFPP's 2012 and 2013 index-based rate increases. Respondent's Br. 13–15. The Shippers see things differently. In their view, the Commission's "decision does not simply take into account updated evidence," but rather "reflects a fundamental change in the standard for evaluating an index-based rate complaint." Petitioners' Br. 31. For two reasons, the Shippers have the better of the argument.

First, the Commission has explained that it relies on pre-rate-increase information not because it lacks more recent evidence, but rather because prior-year data reflects precisely what indexing is supposed to measure: cost changes in the previous year. For example, in a 2009 complaint proceeding the Commission distinguished "general rate" cases from index-based challenges by explaining that, "[i]n contrast" to "a general rate case" that "looks forward," "[t]he indexing method looks backward to the prior year." *Tesoro Refining & Marketing Co. v. SFPP, L.P.*, 129 FERC ¶ 61,114, at P 17 (2009). "[T]he indexing methodology . . . is based on

annualized cost changes between two calendar years," the Commission elaborated, and as such it "relies on actual historical costs, not those that may be projected or updated in a general rate case." *Id.* at PP 17–18. Similarly, in a 2012 order denying a pipeline's request to reopen and supplement the record with post-rate-increase information, the Commission reaffirmed that "[t]he only relevant evidence in indexing cases is the change in the pipeline's cost-of-service in the two years *preceding* the index increase." *SFPP, L.P.*, 140 FERC ¶ 61,016, at P 34 (2012). To be sure, the Commission could have rejected the updated information because, as it now argues, "continual additions" "once a proceeding has commenced . . . would be inconsistent with . . . streamlined ratemaking." *Hollyfrontier Refining & Marketing*, 157 FERC ¶ 61,186, at P 10. But that is not the reason the Commission gave. Instead, it declared that the proffered "later-developed data [was] irrelevant" because "[w]hen ruling on a proposed index increase, the Commission confines its inquiry to comparing the year-to-year change in costs . . . for the two preceding years." *SFPP*, 140 FERC ¶ 61,016, at PP 34, 42. Indeed, despite this court's equivocal dictum on the matter, the Commission's past practice demonstrates that it has always employed a backward-looking approach in indexing proceedings. *Compare United Airlines, Inc. v. FERC*, 827 F.3d 122, 133 (D.C. Cir. 2016) (stating that "whether [the Commission's] indexing mechanism is retrospective or prospective is unclear"), *with* Oral Arg. Rec. 21:12–26 (failing to identify any indexing proceeding in which the Commission considered post-rate-increase information).

Second, in at least three previous complaint cases, the Commission focused solely on pre-rate-increase information from the preceding two years even though post-rate-increase information was presumably available at the time the complaints were filed. In one case, the Commission dismissed

complaints filed in December 2006 and January 2007 against a pipeline's 2005 and 2006 index-based rate increases because, as it concluded, the pipeline permissibly "indexed its . . . rates on July 1, 2005, to reflect that its costs in 2004 exceeded its 2003 costs" and then imposed a "July 1, 2006[,] index-based increase" on the basis of "Page 700 [data] for the calendar year 2005 reflect[ing] an increase in costs" from 2004. *BP West Coast Products LLC v. SFPP, L.P.*, 118 FERC ¶ 61,261, at PP 8–9 (2007). In another case, the Commission explained that it would evaluate a complaint filed in 2007 against a 2005 index-based rate "by comparing the costs incurred [by the pipeline] in the calendar year preceding the index year with the prior year"—that is, by comparing "the pipeline's costs in 2004 with the costs incurred in 2003." *BP West Coast Products LLC v. SFPP, L.P.*, 119 FERC ¶ 61,241, at P 9 (2007). And in still another case, the Commission dismissed a 2007 complaint against a 2006 index-based rate because the pipeline had demonstrated with its "revised 2005 FERC Form No. 6" that its "July 2006 . . . index based increase[] did not substantially exacerbate its current over-recovery." *Tesoro Refining & Marketing Co. v. Calnev Pipe Line, LLC*, 121 FERC ¶ 61,142, at P 7 (2007).

These three decisions—all cited by the Commission in its December 2016 order or by the Shippers in their request for rehearing—belie the Commission's contention that there was something particularly unusual about the Shippers' "delayed filing" and, as a result, that their complaints "presented different circumstances" than the Commission "previously had occasion to address." Respondent's Br. 13, 19 (internal quotation marks omitted). True, as the Commission now points out, because no party to any of those proceedings expressly asked the Commission to consider such updated data, these decisions do not *hold* that post-rate-increase information is irrelevant. *See* Oral Arg. Rec. 21:28–56 (arguing that "the

question was never teed up"). But regardless of what issues the litigants raised in those cases, the fact remains that the Commission repeatedly used pre-rate-increase data to answer the question at hand—whether the rate increases were "substantially in excess of the actual cost increases incurred by the carrier," 18 C.F.R. § 343.2(c)(1)—even though post-rate-increase information was available. Challenged by litigants or not, an agency's "settled course of behavior embodies [that] agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress." *Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 807 (1973) (plurality opinion). Consequently, the Commission's consistent practice, whether adopted expressly in a holding or established impliedly through repetition, sets the baseline from which future departures must be explained. *See id.* (plurality opinion) (explaining that adjudications "generally provide a guide to action that the agency may be expected to take in future cases").

Taken together, these cases demonstrate that when the Commission announced its decision to "consider the data that [becomes] available" "[w]hen shippers delay . . . in filing a complaint," *Hollyfrontier Refining & Marketing*, 162 FERC ¶ 61,232, at P 18, it was adopting a policy inconsistent with its earlier course of conduct. Of course, the Commission is free to "depart from a prior policy or line of precedent" so long as it "acknowledge[s] that it is doing so and provide[s] a reasoned explanation." *Louisiana Public Service Commission v. FERC*, 772 F.3d 1297, 1303 (D.C. Cir. 2014). But the explanation offered in the challenged orders misses this mark.

The Commission's sole justification for its change of heart boils down to this: "it would be inefficient and inequitable to ignore evidence that was available at the time the . . . Shippers filed their complaints." *Hollyfrontier Refining & Marketing*,

162 FERC ¶ 61,232, at P 14 (internal quotation marks omitted). This justification, however, begs a very important question: is the *available* evidence also *relevant* evidence? As the Shippers point out, if "the index is designed to recover cost increases for the period prior to the increase," then "[d]ata relating to periods after the effective date of a proposed index rate increase are irrelevant." Petitioners' Br. 23. In other words, by assuming that any available post-rate-increase information is relevant to its inquiry, the Commission has reinterpreted—without acknowledgement or explanation—the phrase "actual cost increases incurred by the carrier," 18 C.F.R. § 343.2(c)(1), to include not only costs incurred before the *rate's* filing, but also costs incurred before the *complaint's* filing. *See* Oral Arg. Rec. 31:50–32:44 (conceding that the challenged orders changed the Commission's interpretation of "incurred"). And that reinterpretation, in turn, calls into question the purpose of indexing itself. Are index-based rate increases designed to compensate pipelines for cost increases actually incurred in the previous calendar year, costs likely incurred in the current calendar year, or, depending on the type of proceeding, both?

The Commission tells us that we "need not address" the purpose of indexing in order "to resolve this case." Respondent's Br. 21. To an extent, we agree: we would stray too far from our judicial function were we to venture a guess ourselves. *See Ass'n of Oil Pipe Lines*, 83 F.3d at 1431 (explaining that because "ratemaking . . . involv[es] complex industry analyses and difficult policy choices," courts should be "particularly deferential to the Commission's expertise"). But we are not convinced—at least on this record—that the Commission may, consistent with its obligation to engage in reasoned decision making, allow the question to go unanswered. We shall therefore vacate and remand the challenged orders so that the Commission, should it choose to maintain its new policy of considering information that

becomes available between a pipeline's rate increase and a shipper's complaint, can offer a reasoned explanation that either persuasively distinguishes or knowingly abandons its prior inconsistent practice. *See Tennessee Gas Pipeline*, 867 F.2d at 692 (remanding orders in which the Commission had "neither acknowledge[d]" apparently inconsistent "precedents nor purport[ed] either to distinguish them or to explain its apparent rejection of their approach"). Though expressing no opinion on how the Commission should apply the substantially exacerbate test going forward, we emphasize that however the Commission chooses to proceed, it must explain its actions in a way that coheres with the rest of its indexing scheme— namely, the manner in which it establishes yearly indexes and the methods it uses to evaluate challenges to index-based rates. In short, the Commission must provide a reasoned explanation that treats like cases alike.

One final matter requires brief mention. In addition to arguing that the Commission departed from its prior practice without adequate justification, the Shippers claim that, on the same day the Commission issued its March 2018 order, it issued a different order that undermines the evidentiary basis for dismissing the Shippers' complaints. But given that we are vacating the March 2018 order, we need not reach this alternative ground for granting the petitions for review. The Shippers are free to raise this argument on remand.

## III.

For the foregoing reasons, we grant the petitions for review and vacate and remand the Commission's December 2016 and March 2018 orders for further proceedings consistent with this opinion.

*So ordered.*