# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 19, 2020        Decided April 21, 2020

No. 19-5104

PHYSICIANS FOR SOCIAL RESPONSIBILITY, ET AL.,
APPELLANTS

v.

ANDREW WHEELER, ADMINISTRATOR, U.S. ENVIRONMENTAL
PROTECTION AGENCY, IN HIS OFFICIAL CAPACITY,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02742)

———

*Neil Gormley* argued the cause for appellants. With him on the briefs were *Tosh Sagar*, *Michael Burger*, and *Patti Goldman*.

*Robert W. Ferguson*, Attorney General, Office of the Attorney General for the State of Washington, *Kelly T. Wood*, Assistant Attorney General, *Xavier Becerra*, Attorney General, Office of the Attorney General for the State of California, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Daniel I. Rottenberg*, Assistant Attorney General, *Brian E. Frosh*, Attorney General, Office of the Attorney General for

the State of Maryland, *Joshua M. Segal*, Special Assistant Attorney General, *Gurbir S. Grewal*, Attorney General, Office of the Attorney General for the State of New Jersey, *Lisa Morelli*, Deputy Attorney General, *Letitia James*, Attorney General, Office of the Attorney General for the State of New York, *Barbara D. Underwood*, Solicitor General, *Steven C. Wu*, Deputy Solicitor General, *Michael J. Myers*, Senior Counsel, *Ellen F. Rosenblum*, Attorney General, Office of the Attorney General for the State of Oregon, *Josh Shapiro*, Attorney General, Office of the Attorney General for the Commonwealth of Pennsylvania, *Maura Healey*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Christophe Courchesne*, Assistant Attorney General and Chief, *Karl A. Racine*, Attorney General, Office of the Attorney General for the District of Columbia, and *Loren L. AliKhan*, Solicitor General, were on the brief for *amici curiae* the States of Washington, et al. in support of plaintiff-appellants and reversal.

*Shaun A. Goho* was on the brief for *amici curiae* Lynn R. Goldman, et al. in support of appellants and reversal.

*Jeffrey E. Sandberg*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief was *Mark B. Stern*, Attorney.

Before: ROGERS and TATEL, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The Environmental Protection Agency (EPA) utilizes nearly two dozen scientific advisory committees—multimember groups that "review scientific research" relevant to the agency's regulatory objectives and generally "provide advice and expertise from outside the

agency." National Research Council, *Science for Environmental Protection: The Road Ahead* 180 (2012). Historically, EPA advisory committees have included academic scientists who, supported by EPA grants, conduct cutting-edge scientific and technical research important to the agency's statutory mission. In 2017, the EPA Administrator issued a directive that now prohibits all grant recipients from serving on any agency advisory committee. Three scientists who had previously received EPA grants and served on advisory committees, along with several non-profit organizations, filed suit, arguing that the directive was both arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). The district court granted EPA's motion to dismiss, holding that the directive was unreviewable and, in the alternative, lawful. For the reasons explained below, we reverse.

## I.

Several environmental statutes require EPA to ground its decision-making in scientific evidence. The Clean Air Act, for example, mandates that "[a]ir quality criteria . . . accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare," 42 U.S.C. § 7408(a)(2), and the Toxic Substances Control Act requires the Administrator to "make decisions . . . based on the weight of the scientific evidence," 15 U.S.C. § 2625(i).

To effectuate these statutory commands and ensure that "national efforts to reduce environmental risks are based on the best available scientific information," EPA, *Our Mission and What We Do* (Feb. 7, 2018), https://www.epa.gov/aboutepa/our-mission-and-what-we-do, EPA relies on twenty-two advisory committees to provide scientific knowledge relevant

to the agency's statutory objectives. These committees serve a range of functions. Some provide general knowledge across scientific domains, such as the Science Advisory Board (SAB) which offers "scientific advice" to EPA and Congressional committees. 42 U.S.C. § 4365(a). Others are tailored to specific statutory mandates. For example, the Federal Insecticide, Fungicide, and Rodenticide Act requires the Administrator to convene and consult a panel of "7 members appointed by the Administrator from a list of 12 nominees, 6 nominated by the National Institutes of Health and 6 by the National Science Foundation," chosen "on the basis of their professional qualifications to assess the effects of the impact of pesticides on health and the environment." 7 U.S.C. § 136w(d)(1). Similarly, the Clean Air Act requires EPA to create the Clean Air Scientific Advisory Committee (CASAC), directing the Administrator to appoint "seven members including at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies." 42 U.S.C. § 7409(d)(2)(A). And while committees may be "advisory" in name, EPA engagement with such committees is often mandatory. The statute creating the SAB, for example, requires that the Administrator "shall make available" to the Board "any proposed criteria document, standard, limitation, or regulation" created under numerous environmental statutes and shared with any other agency, *id*. § 4365(c)(1), and the Clean Air Act requires that when issuing notice of certain proposed rules, EPA must "set forth or summarize" the findings and recommendations of CASAC and, "if the proposal differs in any important respect from any of these recommendations," EPA must provide "an explanation of the reasons for such differences," *id*. § 7607(d)(3).

EPA advisory committees, like others throughout the federal government, are authorized and regulated by the Federal Advisory Committee Act (FACA), 5 U.S.C. app. II §§ 1 et seq. FACA imposes government-wide procedural requirements on advisory committees, directing them to give advance notice of meetings; hold meetings "open to the public"; allow "[i]nterested persons" to "attend, appear before, or file statements"; keep minutes of each meeting and copies of all reports received, issued, or approved by the committee; and make committee records publicly available. *Id*. § 10(a)–(c). The Act also imposes substantive requirements. Committee "membership," for example, must be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," *id*. § 5(b)(2), and implementing regulations for such a committee "shall . . . contain appropriate provisions to assure that the [committee's] advice and recommendations . . . will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment," *id*. § 5(b)(3).

FACA charges the General Services Administration (GSA) with developing government-wide standards for convening advisory committees. In response, GSA has issued regulations that largely leave appointments to individual agency heads, explaining that "[u]nless otherwise provided by statute, Presidential Directive, or other establishment authority advisory committee members serve at the pleasure of the appointing or inviting authority," and that their "[m]embership terms are at the sole discretion of the appointing or inviting authority." 41 C.F.R. § 102-3.130(a). But that discretion is not boundless. Because advisory committee members are government workers—technically "special Government employee[s]" who perform temporary duties for the federal government for a limited period each year, 18 U.S.C.

§ 202(a)—GSA regulations require that each agency head "must . . . [a]ssure that the interests and affiliations of advisory committee members are reviewed for conformance with applicable conflict of interest statutes . . . and other Federal ethics rules," 41 C.F.R. § 102-3.105(h). GSA regulations, in other words, dictate that advisory committee members, just like all other government employees, are bound by federal ethics rules.

The ethics rules at issue in this case have been promulgated by the U.S. Office of Government Ethics (OGE), which is responsible for implementing two major ethics statutes. The Ethics in Government Act directs OGE to provide "overall direction of executive branch policies related to preventing conflicts of interest on the part of officers and employees of any executive agency." 5 U.S.C. app. § 402(a). And the federal conflict-of-interest statute likewise tasks OGE with identifying "the types of interests that are not so substantial as to be deemed likely to affect the integrity of the services the Government may expect from the employee," 18 U.S.C. § 208(d)(2)(B), and with granting class-wide exemptions from the ethics rules for certain conduct that is "too remote or too inconsequential to affect the integrity of the services of the Government officers or employees," *id.* § 208(b)(2).

Pursuant to these authorities, OGE issued a regulation known as the "Standards of Ethical Conduct for Employees of the Executive Branch," which interprets the conflict-of-interest statute and "establishes uniform standards of ethical conduct" for all executive-branch workers. 57 Fed. Reg. 35,006, 35,006 (Aug. 7, 1992). These detailed regulations tell government employees precisely when they might or might not have an ethics problem. And although recognizing that certain ethics rules "tailored to the functions and activities of a given agency"

might be appropriate, *id.*, OGE requires that agencies wishing to supplement their rules "prepare and submit" any supplemental regulations to OGE "for its concurrence and joint issuance" in the Federal Register, 5 C.F.R. § 2635.105(a)–(b).

Central to this case, OGE has expressly addressed the ethical responsibilities of "special government employees" like EPA advisory committee members who receive agency funding. Specifically, a "special Government employee serving on an advisory committee within the meaning of [FACA] may participate in any particular matter of general applicability where the disqualifying financial interest arises from his non-Federal employment or non-Federal prospective employment, provided that the matter will not have a special or distinct effect on the employee or employer other than as part of a class." *Id.* § 2640.203(g). The regulations spell out what this rule means in practice. For example, "[a] chemist employed by a major pharmaceutical company . . . developing an experimental AIDS vaccine" can ethically serve "on an advisory committee established to develop recommendations for new standards for AIDS vaccine trials," because the chemist's employer "will be affected by the new standards only as part of the class of all pharmaceutical companies and other research entities that are attempting to develop an AIDS vaccine." *Id.* By contrast, "[a]n employee of [a] university" that receives grants from the agency "may not participate in" an advisory committee that focuses on "the evaluation of th[at] university's performance," because the evaluation of that specific university's performance "is not a matter of general applicability." *Id.* According to OGE, then, grantees may ethically serve on advisory committees that affect an otherwise disqualifying interest so long as they limit their participation to topics of broad applicability.

Consistent with OGE's uniform standards, EPA has long allowed individual recipients of EPA grants to serve on its scientific advisory committees, provided they do not address matters related to their individual grants. As a 2013 report from EPA's Office of the Inspector General illustrates, the agency generally "d[id] not consider a prospective or current member's receipt of an agency or other federal research grant to create the basis for a financial conflict of interest." Office of the Inspector General, EPA, *EPA Can Better Document Resolution of Ethics and Partiality Concerns in Managing Clean Air Federal Advisory Committees* 9–10, https://www.epa.gov/sites/production/files/2015-09/documents/20130911-13-p-0387.pdf (2013).

That changed in October 2017, when then-EPA Administrator Scott Pruitt issued a directive titled "Strengthening and Improving Membership on EPA Federal Advisory Committees." Compl., Ex. A ("the Directive"). The Directive provides that "[i]n order to strengthen and improve the independence, diversity, and breadth of participation on EPA federal advisory committees, the Agency shall, consistent with applicable laws and regulations, apply the following principles and procedures when establishing the membership of such committees," and then lists four principles, only one of which is at issue here: "[s]trengthen [m]ember [i]ndependence." *Id.* According to that principle, "[m]embers shall be independent from EPA, which shall include a requirement that no member of an EPA federal advisory committee be currently in receipt of EPA grants, either as principal investigator or co-investigator[,] or in a position that otherwise would reap substantial direct benefit from an EPA grant." *Id.* Simultaneously, the Administrator issued a memorandum that "accompanie[d] and explain[ed]" the principles. Compl., Ex. B ("the Memorandum"). We shall have more to say about that memorandum later in this opinion.

Three organizations—Physicians for Social Responsibility, the National Hispanic Medical Association, and the International Society for Children's Health and the Environment—along with three individuals who have previously received EPA funding and served on advisory committees ("Scientists," as they describe themselves) sued, contending that the Directive violates the APA. In their complaint and its accompanying declarations, the Scientists allege that many advisory committee members received emails asking them to "confirm" that they received EPA grant funding, and, after doing so, were quickly notified that they "had been removed" from their respective committees. Compl. ¶ 60.

The district court granted EPA's motion to dismiss, ruling that the Scientists failed to state a claim for relief because the Directive was committed to agency discretion by law, or, even if subject to APA review, was neither arbitrary and capricious nor contrary to law. *See Physicians for Social Responsibility v. Wheeler*, 359 F. Supp. 3d 27, 35–50 (D.D.C. 2019). This appeal followed. "We review a district court's dismissal of a complaint for failure to state a claim de novo," *Harris v. District of Columbia Water & Sewer Authority*, 791 F.3d 65, 68 (D.C. Cir. 2015), and "'accept as true all material allegations of the complaint,'" *Barker v. Conroy*, 921 F.3d 1118, 1121 (D.C. Cir. 2019) (quoting *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011)). In an appeal from a district court decision reviewing an agency action—as here—"we review the administrative action directly, according no particular deference to the judgment of the District Court." *Holland v. National Mining Association*, 309 F.3d 808, 814 (D.C. Cir. 2002).

**II.**

At the outset, EPA argues that "the APA does not allow review of" the Directive. Appellee's Br. 16. As our court has explained, while "[t]here is a strong presumption of reviewability under the Administrative Procedure Act," *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)), section 701(a) expressly precludes judicial review of "agency action . . . committed to agency discretion by law," 5 U.S.C. § 701(a)(2). Regardless of what ground a challenger invokes under the APA, then, "before any review at all may be had, a party must first clear the hurdle of § 701(a)." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). That provision imposes two related, but distinct, barriers to judicial review.

First, the Supreme Court has "read § 701(a)(2) to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). As the Court explained in *Heckler v. Chaney*, this means that notwithstanding the APA's background presumption of reviewability, certain agency actions are "presumed immune from judicial review." 470 U.S. at 832. The paradigmatic example of presumptively *unreviewable* agency action is "a decision not to institute enforcement proceedings." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (citing *Heckler*, 470 U.S. at 831–32). Other "kinds of administrative determinations [also] evade review" under *Heckler*'s presumption of non-reviewability, including "allocation of funds from a lump-sum appropriation," "the FAA's decision not to renew an aircraft examiner's authority," "an agency's decision to reach a settlement," and "a federal prosecutor's certification that there is a substantial federal interest in a case, required to proceed against a juvenile in

federal court." *Secretary of Labor v. Twentymile Coal Co*., 456 F.3d 151, 156 n.6 (D.C. Cir. 2006) (internal citations omitted).

Second, as the Court explained in *Citizens to Preserve Overton Park, Inc. v. Volpe*, even if agency action is presumptively *reviewable*, section 701(a)(2) also applies "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." 401 U.S. 402, 410 (1971) (internal quotation marks and citation omitted). That is, "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," then there can be no judicial review. *Heckler*, 470 U.S. at 830. As a result, "[b]oth the Supreme Court and this court" have applied section 701(a)(2)'s threshold bar where "'the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion.'" *Twentymile Coal Co*., 456 F.3d at 156 (quoting *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002)).

EPA believes that the Directive is unreviewable under both theories. First, the Directive represents a presumptively unreviewable decision traditionally committed to EPA's discretion because "[a]n agency's elaboration of the principles it intends to follow, for the purpose of identifying preferred candidates for advising the agency on matters within the agency's purview, directly implicates the agency's 'ordering of its [own] priorities' and its expert policy judgment." Appellee's Br. 21 (quoting *Lincoln*, 508 U.S. at 193) (alteration in original). And second, even under a traditional presumption of reviewability, there is no "law to apply" because "none of the statutes governing [EPA's] committees provides any basis for reviewing the merits of the [Directive]." *Id.* at 22, 38. Whatever EPA's starting point under section 701(a)(2), however, the Directive is reviewable.

As our court has explained, regardless of "whether [a] case is governed by *Overton Park* ('no law to apply' so the presumption of reviewability is lost) or *Chaney* (agency action [where a] presumption of non-reviewability has not been overcome)," judicial review is available where there are "meaningful standards to cabin the agency's otherwise plenary discretion." *Drake*, 291 F.3d at 71. And significantly for this case, "judicially manageable standards 'may be found in formal and informal policy statements and regulations as well as in statutes.'" *Steenholdt*, 314 F.3d at 638 (quoting *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987)); *see also Center for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988) ("[R]egulations promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review of agency action.").

GSA's regulations implementing FACA provide just such standards. Although, as EPA emphasizes, those regulations provide that "advisory committee members serve at the pleasure of the appointing or inviting authority" and their "terms are at the [authority's] sole discretion," 41 C.F.R. § 102-3.130(a), they also require that when appointing such members, "[t]he head of each agency . . . *must* . . . [a]ssure that the interests and affiliations of advisory committee members are reviewed for conformance with applicable conflict of interest statutes, regulations issued by the U.S. Office of Government Ethics (OGE) including any supplemental agency requirements, and other Federal ethics rules," *id.* § 102-3.105(h) (emphasis added). Indeed, our court has found meaningful standards to apply "under far more permissive and indeterminate language." *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007). In one case, for example, we found that a statute requiring nothing more than "high quality and cost-effective" care provided a reviewable standard. *Id.* at 611. In another, we found "law to apply" in a statute providing that the Army Board

for Correction of Military Records "'*may* excuse a failure to file . . . *if it finds it to be in the interest of justice*.'" *Dickson v. Secretary of Defense*, 68 F.3d 1396, 1398 (D.C. Cir. 1995) (emphasis added) (quoting 10 U.S.C. § 1552(b)). Set against this precedent, the mandatory language of GSA's regulations—agency heads "must . . . assure" compliance with federal ethics rules—provides "meaningful standards for defining the limits of [the agency's] discretion," giving us "'law to apply' under § 701(a)(2)." *Heckler*, 470 U.S. at 834. We therefore turn to the merits of the Scientists' APA claims.

## III.

The Scientists allege that the Directive runs afoul of the APA in three ways: one, it is contrary to law because EPA has no authority to deviate from OGE's ethics regime; two, it is arbitrary and capricious because it lacks a reasoned explanation; and three, it is procedurally flawed because EPA failed to submit it to OGE for approval. We address each in turn.

## A.

In support of their first claim, the Scientists argue that the Directive adopts appointment conditions "inconsistent with the uniform and binding ethics standards established by the Ethics Office." Appellants' Br. 26. As they see it, because OGE is tasked with promulgating uniform standards of conduct for the executive branch, EPA has no discretion to deviate from OGE's ethics standards; any EPA appointment policy "must prohibit what [OGE] ethics rules prohibit, and allow what the rules allow." *Id.* at 31.

The plain text of OGE's uniform standards dooms the Scientists' claim. Those standards expressly acknowledge that if an agency "wishes," it may promulgate supplemental rules

that operate "[i]n addition to the substantive provisions" of OGE's regime. 5 C.F.R. § 2635.105(a)(2). And in the Federal Register notice announcing the uniform standards, OGE explained that because agencies may need to "tailor[]" their ethics rules "to the functions and activities of a given agency," the uniform standards provide "authority for individual agencies to issue" additional agency-specific rules. *Standards of Ethical Conduct for Employees of the Executive Branch*, 57 Fed. Reg. at 35,006. To be sure, as we shall later explain in our discussion of the Scientists' procedural challenge, *infra at* Part III.C, an agency seeking to depart from OGE's uniform rules may have to comply with OGE's supplemental-regulation process. But to the extent the Scientists view the Directive as an impermissible deviation from OGE rules, that grievance is procedural, not substantive. The district court therefore correctly dismissed the Scientists' claim that the Directive is contrary to law merely because it differs from OGE's uniform standards.

**B.**

In support of their claim that EPA's new policy is arbitrary and capricious because it lacks the indicia of a reasoned decision, the Scientists argue that "the Directive and Memorandum evidence no awareness that EPA's new position contradicts the executive-branch ethics standards" and the agency "failed to rationally address its previous conclusion . . . that EPA grantees can provide objective and unbiased advice on matters unrelated to their grants." Appellants' Br. 47, 52. We agree with the latter point.

It is axiomatic that the APA requires an agency to explain its basis for a decision. We are hardly the first panel to quote *State Farm*'s maxim that "the agency must examine the relevant data and articulate a satisfactory explanation for its

action." *Motor Vehicle Manufacturers Association of U.S. v. State Farm Mutual Automotive Insurance Co.*, 463 U.S. 29, 43 (1983). This foundational precept of administrative law is especially important where, as here, an agency changes course. Reasoned decision-making requires that when departing from precedents or practices, an agency must "offer a reason to distinguish them or explain its apparent rejection of their approach." *Southwest Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019) (internal quotation marks and citation omitted). To be sure, in *FCC v. Fox Television Stations, Inc*, the Supreme Court made clear that "*State Farm* neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance." 556 U.S. 502, 514 (2009). But "however the agency justifies its new position, what it may not do is 'gloss[] over or swerve[] from prior precedents without discussion.'" *Southwest Airlines*, 926 F.3d at 856 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).

Recall that EPA announced its new policy in a single-page Directive, along with a memorandum explaining its rationale. The challenged "principle" states:

> *Strengthen Member Independence*: Members shall be independent from EPA, which shall include a requirement that no member of an EPA federal advisory committee be currently in receipt of EPA grants, either as principal investigator or co-investigator[,] or in a position that otherwise would reap substantial direct benefit from an EPA grant. This principle shall not apply to state, tribal or local government agency recipients of EPA grants.

Directive at 1.

That "principle" represents a major break from the agency's prior policy, under which grantees regularly served on advisory committees. As EPA's Office of the Inspector General explained in its 2013 report, while "[a] prospective or active member's research or grant is a potential area of concern if the [Federal Advisory Committee], panel, or subcommittee plans to address work performed under the research grant," the agency generally "d[id] not consider a prospective or current member's receipt of an agency or other federal research grant to create the basis for a financial conflict of interest." Office of the Inspector General, *supra*, at 9–10. Making the same point, EPA's Peer Review Handbook states that "when a scientist is awarded an EPA research grant through an investigator-initiated, peer-reviewed competition, there generally should be no question as to that scientist's ability to offer independent scientific advice to the Agency on other projects." Science and Technology Policy Council, EPA, *Peer Review Handbook* 77 (4th ed. 2015), https://www.epa.gov/sites/production/file/ 2016-03/documents/epa_peer_review_handbook_4th_edition. pdf. That policy comported with the view of OGE, which explained that "[a] special Government employee serving on an advisory committee" who would otherwise be disqualified "may participate in any particular matter of general applicability" so long as that "matter will not have a special or distinct effect on the employee or employer other than as part of a class." 5 C.F.R. § 2640.203(g).

Reading the Directive, however, one would have no idea about the existence of these prior policies. The Directive simply declares "that no member of an EPA federal advisory committee be currently in receipt of EPA grants." Directive at 1. The accompanying Memorandum is equally silent with respect to EPA's prior policy. Here is its entire text, and not a peep:

> A vital part of ensuring integrity and confidence in EPA's [Federal Advisory Committees] comes from guaranteeing that [Committee] members remain independent of the Agency during their service. EPA [Committee] members should avoid financial entanglements with EPA to the greatest extent possible.

> Non-governmental and non-tribal members in direct receipt of EPA grants while serving on an EPA [Committee] can create the appearance or reality of potential interference with their ability to independently and objectively serve as a [Committee] member. [Committee] members should be motivated by service and committed to providing informed and independent expertise and judgment.

> Ensuring [Committee] member independence strengthens the integrity, objectivity and reliability of EPA [Committees]. Accordingly, in addition to EPA's existing policies and legal requirements preventing conflicts of interest among the membership of the Agency's [Committees], it shall be the policy of the Agency that no member of an EPA federal advisory committee currently receive EPA grants, either as principal investigator or co-investigator, or in a position that otherwise would reap substantial direct benefit from an EPA grant. This principle should not apply to state, tribal or local government agency recipients of EPA grants.

Memorandum at 3.

EPA nonetheless argues that the Directive and Memorandum "clearly satisf[y]" APA standards because "[t]he EPA Administrator issued the Directive precisely in order to publicize the agency's new priorities." Appellee's Br. 42.

"Anyone reading the Directive and accompanying memorandum," EPA insists, "would understand that it was being issued precisely because EPA was marking a policy change." *Id.* at 43. In its view, nothing more is required. In support, and quoting *FCC v. Fox Television*, EPA argues that having acknowledged its change in course by issuing the Directive, "to withstand APA review, 'it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better.'" *Id.* at 43 (quoting 556 U.S. at 515).

EPA misunderstands the lesson of *Fox Television*. True, that decision makes clear that when changing position "[an] agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate," nor "demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." 556 U.S. at 515. Nothing in *Fox Television*, however, absolves an agency of its obligation "to enable" a reviewing court to conclude that the agency's action "was the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52. In *Fox Television* itself, the Court explained that the rule that an agency must "display awareness that it *is* changing position" is simply a species of the more general "requirement"—present in *all* APA cases—"that an agency provide [a] reasoned explanation for its action." 556 U.S. at 515. As the Supreme Court subsequently explained in *Encino Motorcars, LLC v. Navarro*, although agencies remain "free to change their existing policies," they still must "provide a reasoned explanation for the change." 136 S. Ct. 2117, 2125 (2016).

This EPA did not do. Regardless of whether the Directive's references to "improving" and "strengthening" Committee independence might have been sufficient to *acknowledge* EPA's change in policy, the Directive and its

accompanying Memorandum failed to "provide a reasoned explanation for the change." *Id; see also State Farm*, 463 U.S. at 43 (requiring agencies to "articulate a satisfactory explanation for its action"). The Memorandum announces that individuals "in direct receipt of EPA grants while serving on an EPA [Federal Advisory Committee] *can* create the appearance or reality of potential interference with their ability to independently and objectively serve as a FAC member," Memorandum at 3 (emphasis added), yet nowhere even hints that EPA and OGE—the agency tasked with defining conflicts of interest—had previously reached exactly the opposite conclusion: that grantees could, in fact, ethically serve. To be sure, "no statute required specific discussion of th[ese ethics rules] or any other topic," Appellee's Br. 44, but core principles of administrative law dictate that "an agency changing its course must supply a reasoned *analysis* indicating that prior policies and standards are being deliberately changed, not casually ignored," *Lone Mountain Processing, Inc. v. Secretary of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (emphasis added) (internal quotation marks omitted). That "analysis" is entirely missing from the Directive and its accompanying Memorandum. An agency's wholesale failure to address "past practice and formal policies regarding [an issue], let alone to explain its reversal of course . . . [is] arbitrary and capricious." *American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017).

The Administrator's failure to address OGE and EPA's contrary conclusions is especially glaring given that the prior regime existed, in part, for the very purpose of facilitating the critical role played by EPA's scientific advisory committees. As noted above, EPA operates pursuant to multiple statutory mandates requiring that its decisions rest on various formulations of "the best available science." 15 U.S.C. § 2625(h). And as EPA's Peer Review Handbook explains, the

agency's prior policy—allowing EPA grantees to serve on advisory committees—existed, in part, to "ensure that the scientific and technical bases of its decisions . . . are based upon the best current knowledge from science, engineering, and other domains of technical expertise; and . . . are credible." Science and Technology Policy Council, EPA, *Peer Review Handbook*, *supra*, at A-4. Even the Directive itself agrees that "it is in the public interest to select the most qualified, knowledgeable, and experienced candidates." Directive at 1. Yet the Directive nowhere confronts the possibility that excluding grant recipients—that is, individuals who EPA has independently deemed qualified enough to receive competitive funding—from advisory committees might exclude those very candidates. The question, of course, is not whether the Directive, in fact, shrinks EPA's pool of experts but rather whether EPA has given an adequate *explanation* for its new policy. And in failing to grapple with how EPA's policy affected its statutory scientific mandates, the Directive "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

At oral argument, agency counsel contended that the Directive need not have addressed any prior ethics policy because it focused on "guaranteeing that [advisory committee] members remain independent of the agency," and therefore does not implicate ethics or "conflicts of interest at all." Oral Arg. Tr. 40. But that sharp distinction between "conflicts of interest" or ethics, on the one hand, and "independence," on the other, appears nowhere in EPA's briefs, and "[g]enerally, arguments raised for the first time at oral argument are forfeited," *United States ex rel. Davis v. District of Columbia,* 793 F.3d 120, 127 (D.C. Cir. 2015). In any event, EPA itself refers to the Directive as "ethics-related" throughout its brief, *see, e.g.*, Appellee's Br. 17 (contending that "nothing in federal ethics law purports to limit the factors—including ethics-

related factors—that an agency may, in its discretion, consider in prioritizing its committee appointments"). Moreover, in terms of EPA's obligation to *explain* its reasoning, any discrepancy between "independence" and "ethics" is a distinction without a difference. EPA previously concluded that grantees were capable of offering it independent advice; it now concludes they are not. However EPA chooses to characterize the Directive's focus, its earlier determination, consistent with OGE's conclusion, was clearly a "relevant factor[]" the agency had to consider. *State Farm*, 463 U.S. at 42.

Finally, EPA argues that "the Directive was issued against a backdrop of well-known public disagreement regarding whether the existing [OGE] regime was adequate." Appellee's Br. 46. Perhaps so, but that justification appears nowhere in either the Directive or Memorandum. EPA was required to "provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision," *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990), and counsel may not now "supply a reasoned basis for the agency's action that the agency itself has not given," *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86 (1974).

Of course, nothing prevents EPA from developing an appointment policy that excludes individuals it previously allowed to serve. To do so, however, EPA must explain the basis for its decision. Because the Directive contains no discussion of OGE's or EPA's prior conclusion at all, the Directive "cross[ed] the line from the tolerably terse to the intolerably mute." *Greater Boston Television Corp.*, 444 F.2d at 852.

## C.

This brings us to the Scientists' argument that the Directive is procedurally invalid and therefore contrary to law. In support, they rely on OGE regulations that provide a dedicated procedural mechanism for allowing "[e]ach agency . . . [to] issue regulations not inconsistent with this part and this subchapter," using a specific process and "subject to the prior approval of the Office of Government Ethics." 5 C.F.R. § 2638.602. Pursuant to those procedures, an agency may promulgate such "[s]upplemental agency regulations which the agency determines are necessary and appropriate, in view of its programs and operations, to fulfill the purposes of [Part 2635]." *Id*. § 2635.105(a). To do so, however, the agency must "prepare and submit" the supplemental regulations to OGE "for its concurrence and joint issuance" in the Federal Register. *Id*.

EPA does not claim to have complied with this process. Instead, it argues that the Directive falls outside the regulations' purview altogether. According to EPA, "the Directive does not seek to amend [ethics requirements] or to impose legally binding ethical requirements on EPA employees" but instead "is a statement of EPA's discretionary policies and priorities for selecting the agency's advisory-committee members, who 'serve at the pleasure of' the agency." Appellee's Br. 33 (quoting 41 C.F.R. § 102-3.130(a)). In other words, like its contention that the Directive affects only grantee "independence," EPA argues that the Directive is so far afield of an "ethics rule" that OGE's process is simply inapplicable.

This argument fails for the same reasons as EPA's contention that it had no obligation to address its prior ethics policy: regardless of how EPA describes its new policy, the Directive invokes "the appearance or reality of potential

interference" to exclude individuals whom OGE concluded were allowed to serve. Directive at 1. That policy falls squarely within OGE's ethics wheelhouse, and OGE guidance, cited by EPA, confirms this understanding. As the guidance explains, "[i]mplementation . . . [of a] policy requiring the expansion of restrictions on agency employees set by the Standards of Ethical Conduct is likely to implicate the supplemental regulation process," as are policies that touch on "outside activity restrictions, prior approval requirements for outside activities, [or] prohibited financial holdings." Memorandum from Don W. Fox, General Counsel, to Designated Agency Ethics Officials 2 (Oct. 31, 2011), Appellants' Br. Add. 76. And although the Guidance clarifies that compliance with the supplemental process is unnecessary where "agencies . . . advise employees to uphold a stricter standard of ethical conduct *voluntarily as a best practice*," an agency "may not implement . . . [a] policy *requiring* some or all of its employees [to] receive prior approval before engaging in outside activities without issuing a supplemental ethics regulation." *Id.* (emphasis added).

Set between the poles of agency policies "advis[ing] employees" on "best practice[s]" (which do not require joint issuance) and those "requir[ing] . . . employees [to] receive prior approval" (which do), the Directive clearly falls into the latter category. It speaks in mandatory, not advisory terms: "[m]embers *shall* be independent from EPA, which *shall* include a requirement that no member of an EPA federal advisory committee be currently in receipt of EPA grants." Directive at 1 (emphasis added). This, moreover, is precisely how the Directive was understood. In a declaration filed by the Scientists, a former Director of EPA's Science Advisory Board states that he "understood that the requirement that a member of an advisory committee not be a recipient of an EPA grant

was mandatory and that EPA staff were required to apply it." Zarba Decl. 6, Joint Appendix 124.

EPA has one more argument up its sleeve. Even were it required to comply with the OGE process, it argues, failure to do so cannot form the predicate for an APA challenge because of a disclaimer contained in the OGE regulations stating:

> A violation of this part or of supplemental agency regulations, as such, does not create any right or benefit, substantive or procedural, enforceable at law by any person against the United States, its agencies, its officers or employees, or any other person.

5 C.F.R. § 2635.106(c). EPA interprets this language to preclude judicial review of any failure to comply with OGE's process. We disagree.

The disclaimer applies only to individuals seeking to enforce "rights or benefits" *created by* the regulations; it has nothing to say about challenges brought under the Administrative Procedure Act. Nor could it. A properly promulgated regulation, standing alone, cannot thwart judicial review otherwise available under the APA. Our court has made clear that agencies "cannot adopt regulations erasing the presumption of reviewability embodied in the APA unless [the underlying statute] reveals clear and convincing evidence that Congress intended to foreclose judicial review." *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447, 1450 (D.C. Cir. 1994) (internal quotation marks omitted). Neither the Ethics in Government Act nor the federal conflict-of-interest statute contains such "clear and convincing evidence."

True, as EPA points out, we have read language like the disclaimer to preclude judicial review of executive orders or

informal, internal agency documents. *See* Appellee's Br. 34–35 (citing, *e.g.*, *Air Transportation Association of America v. FAA*, 169 F.3d 1, 8 (D.C. Cir. 1999) (holding that an executive order requiring a "systematic analysis of expected benefits and costs" is "not subject to judicial review")). But for APA purposes at least, an executive order is a far cry from a final rule "adopted pursuant to notice and comment rulemaking and undoubtedly . . . intended to carry the force of law." *Aid Association for Lutherans v. U.S. Postal Serv*ice, 321 F.3d 1166, 1174 (D.C. Cir. 2003). And, as explained above, such a final rule cannot preclude judicial review on its own. An agency's failure to comply with OGE's process is therefore subject to judicial review irrespective of the disclaimer.

## IV.

For the foregoing reasons, we reverse the district court's dismissal of the complaint and remand for further proceedings consistent with this opinion.

*So ordered.*