# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 1, 2022        Decided August 2, 2022

No. 21-1180

FINNBIN, LLC,
PETITIONER

v.

CONSUMER PRODUCT SAFETY COMMISSION,
RESPONDENT

———

On Petition for Review of a Final Rule
of the Consumer Product Safety Commission

———

*Kathleen R. Hartnett* argued the cause for petitioner. With her on the briefs was *Julie Veroff*.

*Daniel Winik*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief was *Brian M. Boynton*, Acting Assistant Attorney General, and *Scott R. McIntosh*, Attorney.

*Rachel M. Weintraub* and *Oriene H. Shin* were on the brief for *amici curiae* Consumer Reports, et al. in support of respondent.

Before: MILLETT, PILLARD, and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:   The Consumer Product Safety Commission promulgated a mandatory safety standard governing all previously unregulated infant sleep products, including ones for which there was no voluntary safety standard in effect.   We consider whether the CPSC had statutory authority to promulgate this standard and whether it acted arbitrarily in doing so.

I

A

The Consumer Product Safety Act empowers the CPSC to promulgate "consumer product safety standards" including performance requirements, warnings, and instructions.   15 U.S.C. § 2056(a).   Before promulgating a standard, the Commission must prepare a final regulatory analysis and make a host of findings about costs and benefits.   *Id.* § 2058(f).   The agency must stay its hand if a voluntary standard adopted by a private group adequately reduces the relevant product risks and will likely achieve substantial compliance.   *Id.* § 2056(b)(1).

The Act also permits the CPSC to ban hazardous consumer products.   To do so, the Commission must find that the product at issue presents an unreasonable risk of injury and that no feasible safety standard would adequately protect the public from it.   15 U.S.C. § 2057.   In banning products, the CPSC must follow the procedures that govern its general power to promulgate safety standards.   *See id.*

Section 104 of the Consumer Product Safety Improvement Act creates special rules regarding the promulgation of safety

standards for durable infant or toddler products. Section 104(b)(1) provides:

> The Commission shall—
>
> (A) in consultation with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts, examine and assess the effectiveness of any voluntary consumer product safety standards for durable infant or toddler products; and
>
> (B) in accordance with section 553 of title 5, promulgate consumer product safety standards that—
>
>> (i) are substantially the same as such voluntary standards; or
>>
>> (ii) are more stringent than such voluntary standards, if the Commission determines that more stringent standards would further reduce the risk of injury associated with such products.

15 U.S.C. § 2056a(b)(1). Section 104(b)(2) directs the CPSC to promulgate safety standards for at least two "categories of durable infant or toddler products" every six months "until the Commission has promulgated standards for all such product categories." *Id.* § 2056a(b)(2). The CPSC also must periodically review and revise these standards to ensure that they "provide the highest level of safety for such products that is feasible." *Id.*

4

B

Between 2009 and 2016, the CPSC used its section 104 authority to set standards for five kinds of infant sleep products: bassinets and cradles, full-size cribs, non-full-size cribs, play yards, and bedside sleepers. 16 C.F.R. pts. 1218–22. In 2017, it issued a notice of proposed rulemaking to address a sixth kind, infant inclined sleep products, which have a surface inclined more than ten degrees. 82 Fed. Reg. 16,963, 16,964 (Apr. 7, 2017). As proposed, the standard would have largely tracked a voluntary standard for infant inclined sleep products established by the private organization ASTM International. *Id.* at 16,968–69.

In 2019, the CPSC issued a supplemental notice proposing a different standard. The Commission proposed to expand its new mandatory standard to encompass all infant sleep products not already covered by a CPSC standard. 84 Fed. Reg. 60,949, 60,956 (Nov. 12, 2019). The notice further proposed to impose on these products the requirements governing bassinets and cradles. *Id.* These include requirements to have a firm stand and an elevated sleeping surface, as well as minimum strength and stability standards. 16 C.F.R. pt. 1218. In issuing this proposal, the CPSC leapfrogged an ongoing ASTM effort to create a voluntary standard for infant flat sleep products.

A divided CPSC adopted the rule, which became effective on June 23, 2022. *See* 86 Fed. Reg. 33,022 (June 23, 2021) (codified at 16 C.F.R. pt. 1236).

C

Until recently, Finnbin, LLC sold baby boxes, an infant flat sleep product covered by the final rule. Baby boxes are cardboard boxes with a small mattress at the bottom. Finnbin's

boxes lack a firm stand and elevation, so Finnbin may no longer sell them as designed.

Finnbin seeks judicial review of the final rule. We have jurisdiction under 15 U.S.C. § 2056a(b)(3).

II

Finnbin makes two arguments why, in its view, the final rule exceeds the CPSC's statutory authority under section 104. We reject both contentions.[1]

A

Finnbin's primary argument turns on the word *stringent*. Section 104(b)(1) permits the CPSC to promulgate mandatory safety standards that are "more stringent" than extant voluntary standards. 15 U.S.C. § 2056a(b)(1). According to Finnbin, to make a safety standard "more stringent" is to make it apply more strictly to previously covered products or product types. For example, because an extant voluntary standard covers infant inclined sleep products, the Commission may impose stricter standards on them. But, Finnbin continues, the power to make a safety standard "more stringent" does not include the power to extend it to additional products, which Finnbin describes as a separate matter of *scope*. Accordingly, because the extant voluntary standard here covers only inclined sleep

---

[1] We reject the CPSC's argument that Finnbin failed to preserve these claims before the agency. Absent a contrary statutory requirement, issue preservation is unnecessary "when the agency has in fact considered the issue." *NRDC, Inc. v. EPA*, 824 F.2d 1146, 1151 (D.C. Cir. 1987) (en banc). Here, the CPSC explained at length its view that section 104 authorizes the final rule. 86 Fed. Reg. at 33,056–59.

products, the Commission could not impose a broader standard extending to previously unregulated flat sleep products.

Finnbin's proposed distinction between stringency and scope is hardly obvious. As a matter of ordinary meaning, the stringency of a standard refers to its strictness or rigor. *See*, *e.g.*, *Stringent*, *Oxford English Dictionary* (2d ed. 1989) ("Rigorous, strict, thoroughgoing; rigorously binding or coercive"); *Stringent*, *American Heritage Dictionary* (2d college ed. 1985) ("Imposing rigorous standards of performance; severe"); *Stringent*, *Webster's Third New International Dictionary* (1961) ("marked by rigor, strictness, or severity"). These definitions plainly include Finnbin's proposed interpretation. For example, the Secretary of Transportation can make a fuel-economy standard "more stringent" by increasing the number of miles that covered vehicles must be able to travel per gallon of fuel. 49 U.S.C. § 32902(g)(2). But it is also natural to speak of stringency as including what Finnbin calls scope—a requirement can be made stricter or more rigorous by being made more broadly applicable. For example, in construing a statutory requirement of program "stringency," we upheld an administrative interpretation of that term to encompass both "the substantive rigor of the program" and "its geographic scope." *NRDC, Inc. v. EPA*, 22 F.3d 1125, 1141–42 (D.C. Cir. 1994) (per curiam). So even though Finnbin highlights one kind of stringency, the concept still may extend to matters of scope.

In this case, statutory structure confirms the broader definition. Section 104(b)(2) directs the CPSC to promulgate safety standards for at least "2 categories of durable infant or toddler products every 6 months" until it "has promulgated standards for all such product categories." 15 U.S.C. § 2056a(b)(2). Section 104(b)(2) thus requires the CPSC to act steadily until it has set mandatory standards for all categories

of "durable infant or toddler products"—a defined term not limited to products for which a voluntary safety standard is in place. *See id.* § 2056a(f)(1) ("a durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years"). By restricting the Commission's section 104 power to products or product types already subject to a voluntary standard, Finnbin's interpretation would make this command impossible for the CPSC to carry out unless private organizations happened to promulgate voluntary standards for all product categories. No such comprehensive voluntary standards existed when the CPSIA was enacted in 2008, just as none exist today. And we strongly disfavor any interpretation that would make statutory commands unfulfillable. *See, e.g.*, *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 161 (D.C. Cir. 2017) ("*Ought* implies *can*."); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* § 4 (2012) ("Presumption Against Ineffectiveness").

Finnbin responds that we should disregard the command of section 104(b)(2) because that provision merely sets forth a timetable. But the fact that section 104(b)(2) establishes a "[t]imetable for rulemaking," and is so titled, does not prevent it from having further substantive import. *See Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 399 (D.C. Cir. 2004) ("the section title of a statute is not dispositive of its meaning"). The text of section 104(b)(2), in requiring mandatory standards for "all" categories of durable infant or toddler products, provides a decisive contextual clue that the standards must extend to products not covered by voluntary ones.

Finnbin also urges skepticism of what it describes as the CPSC's claim to have "discover[ed] in a long-extant statute an unheralded" major power. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). Finnbin notes that the CPSC has never before invoked section 104 to extend a voluntary standard to

new products. But any initial skepticism cannot withstand the express statutory command to regulate all categories of durable infant or toddler products. And it is hardly surprising that the CPSC, in doing so, would begin with product categories for which a voluntary standard already exists. We are also not concerned that, before promulgating the final rule, the CPSC urged ASTM to extend its voluntary standard from inclined to flat sleep products. The fact that the CPSC seeks to collaborate with private standard-setting organizations where possible hardly speaks to the limit of its statutory authority.

B

Finnbin further contends that section 104 permits the CPSC to impose safety standards but not product bans, which it says must be done under 15 U.S.C. § 2057. Moreover, Finnbin continues, the final rule bans products like baby boxes.

We assume that section 104, like the CPSC's general authority to promulgate consumer product safety standards, does not encompass the power to ban entire products. But the final rule cannot fairly be characterized as doing so. On some level, any performance requirement may loosely be described as a ban on non-conforming products. A requirement for cars to have seatbelts bans cars without seatbelts. Yet the Commission has broad authority to promulgate "performance requirements" for consumer products, 15 U.S.C. § 2056(a)(1), as distinct from its restricted authority to ban entire consumer "product[s]" under 15 U.S.C. § 2057. And so not every performance requirement may be recast as a product ban.

By its terms, the final rule creates performance requirements for infant sleep products not already covered by a section 104 standard. 16 C.F.R. pt. 1236. Finnbin provides no reason to think that the rule effectively bans any discrete product. For one thing, Finnbin quietly acknowledges that

baby boxes can have a stand. *See* Opening Br. at 44 ("*most* baby boxes … do not have legs" (emphasis added)). That alone confirms that the rule operates as a ban only on Finnbin's particular design. Finnbin also fails to show that baby boxes (with or without a stand) are a discrete product. Instead, it argues only that the rule forces manufacturers either to redesign their products or to take them off the market—precisely the choice that every manufacturer of a non-conforming product faces. None of this establishes a product ban subject to the constraints of 15 U.S.C. § 2057.[2]

## III

Finnbin next argues that the final rule is arbitrary, and so must be set aside under 5 U.S.C. § 706(2)(A). In evaluating this contention, we ask whether the CPSC "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

Finnbin primarily argues that the CPSC failed to explain why the rule should cover baby boxes specifically, given what Finnbin asserts to be their distinct risks and benefits. Finnbin faces an uphill battle in making this kind of argument, for in formulating general rules, "a regulator need not always carve out exceptions for arguably distinct subcategories of projects." *Long Island Power Auth. v. FERC*, 27 F.4th 705, 715 (D.C. Cir. 2022) (quoting *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1262 (D.C. Cir. 2018)).

---

[2] Because plain statutory language supports the CPSC's reading, we need not assess questions of deference. *See Ams. for Clean Energy v. EPA*, 864 F.3d 691, 716 n.5 (D.C. Cir. 2017).

10

A

In assessing the risks of infant sleep products, the CPSC reviewed more than 150 incident reports detailing problems caused by the products. Finnbin contends that because none of them involved baby boxes, the Commission had no reasonable basis to conclude that baby boxes present risks. We disagree.

The final rule reasonably encompasses all previously unregulated infant sleep products. Observing patterns that cut across different product designs, the CPSC identified risks and explained how its proposed safety features would reduce them. For example, the agency noted reports of products tipping over when placed on unstable surfaces such as sofas. 86 Fed. Reg. at 33,043. It reasonably concluded that this risk inheres in all flat-bottomed products, which can easily be placed on such surfaces. *Id.* And it reasonably concluded that requiring a firm stand and elevated mattress would mitigate the risk. *Id.* Seeing risks that cut across different product types, the Commission reasonably made its rule correspondingly broad. Finally, the agency reasonably discounted the absence of incident reports specifically involving baby boxes, which are purchased by less than one percent of United States households with newborns. *See* 86 Fed. Reg. at 33,028.

In contending that the CPSC failed to provide an adequate explanation, Finnbin highlights cases faulting the Commission for relying on "imprecis[e]" injury reports, *Zen Magnets, LLC v. CPSC*, 841 F.3d 1141, 1151 (10th Cir. 2016), or failing to "make precise estimates" of the relevant safety risks, *Gulf S. Insulation v. CPSC*, 701 F.2d 1137, 1146 (5th Cir. 1983). But these cases involved rules promulgated under the Consumer Product Safety Act—which, unlike section 104, requires a rigorous cost-benefit analysis. *See* 15 U.S.C. § 2058. So,

these cases cast no light on how much qualitative analysis is required under section 104 and the APA.

## B

Finnbin likewise argues that the CPSC unreasonably failed to consider the assertedly distinct safety benefits of baby boxes. It points to three pieces of evidence: a survey of new parents who were provided baby boxes; the fact that the infant mortality rate in Finland has dropped since the 1930s, when baby boxes were first introduced there; and the absence of incident reports involving baby boxes. None of this evidence required a response. The survey does not suggest that baby boxes are safer than the other kinds of infant sleep products. It simply notes how likely parents are to use baby boxes if given them. The decline in Finland's infant mortality rate over the last century could readily be attributed to any number of factors besides the use of baby boxes, such as medical and educational advances over the same period. And as explained above, the absence of incident reports involving baby boxes hardly proves anything, given their tiny share of the U.S. market. Moreover, the CPSC had other reasons to regard baby boxes with skepticism, such as a comment by the American Academy of Pediatrics that baby boxes were "not yet proven to be safe and effective." J.A. 293.

The CPSC had ample reason not to carve out baby boxes from the operation of its general rule.

## C

Finally, Finnbin contends that the Commission ignored a distinct safety benefit of in-bed sleepers. Echoing the dissent of Commissioner Baiocco, J.A. 730–32, Finnbin asserts that the stand requirement will prevent parents who wish to share their bed with an infant from using in-bed sleepers. Instead,

such parents will place the infant directly on their mattress, which is assertedly more dangerous. Whatever the merits of this argument, Finnbin lacks standing to press it.

"Standing is not dispensed in gross." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (cleaned up). Rather, a petitioner must establish standing "for each claim [it] seeks to press and for each form of relief that is sought." *Id.* (cleaned up); *see CEI v. FCC*, 970 F.3d 372, 382 (D.C. Cir. 2020). In other words, for each claim, the petitioner must establish that it has suffered an injury in fact that is traceable to the challenged action and likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). If any of these elements is lacking, we may not consider the merits of a claim. *See id.*

Finnbin's final argument attacks the rule as applied to in-bed sleepers. If the rule were arbitrary only as applied to that narrow category of infant sleep products, we would vacate it only as so applied: Successful challenges to one aspect of a rule yield partial vacatur unless there is "substantial doubt" that the agency would have left the balance of the rule intact. *North Carolina v. FERC*, 730 F.2d 790, 796 (D.C. Cir. 1984); *see NRDC v. Wheeler*, 955 F.3d 68, 81–82 (D.C. Cir. 2020). And there is no reason to think that the CPSC, if it could not lawfully apply its new safety rules to in-bed sleepers, would have preferred no new rules at all. So Finnbin's argument about the asserted benefits of in-bed sleepers, if successful, would yield only vacatur of the rule as applied to in-bed sleepers. And because Finnbin manufactures a different kind of infant sleep product—baby boxes—that remedy would not redress its economic injury.

In response, Finnbin argues that partial vacatur would enable it to begin selling baby boxes as in-bed sleepers. But to confer standing, an injury must be "actual or imminent, not

13

conjectural or hypothetical." *Defs. of Wildlife*, 504 U.S. at 560 (cleaned up); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Finnbin offers nothing to support its bald assertion that, but for the final rule, it "could and would market its baby boxes … as in-bed sleepers." Reply Br. at 28. For one thing, this statement strains credulity. As the CPSC points out, it is hard to see how Finnbin could market its product—a cardboard box with sides nearly a foot tall—as one to facilitate bedsharing. And regardless, "general averments, conclusory allegations, and speculative some day intentions are inadequate to demonstrate injury in fact." *Worth v. Jackson*, 451 F.3d 854, 858 (D.C. Cir. 2006) (cleaned up).

IV

We deny in part and dismiss in part the petition for review.

*So ordered.*